First National Bank in Walsenburg, Transferee [1] v. Commissioner. First Nat'l Bank v. Commissioner
Docket No. 1522-63.
United States Tax Court
T.C. Memo 1965-286; 1965 Tax Ct. Memo LEXIS 44; 24 T.C.M. (CCH) 1597; T.C.M. (RIA) 65286; October 28, 1965
*44 In 1958, First National Bank in Walsenburg, a newly formed national bank, assumed the obligations of First State Bank of Walsenburg, a Colorado state bank, arising out of the latter's depositors' accounts and certain other liabilities. At the same time, State transferred assets consisting of mortgages, loans and discounts, bonds, and cash having a face value equal to the face amount of the obligations assumed by National. In 1961, State received two Federal income tax refund checks and transferred them to National to compensate National for the difference between the face value and actual value of certain of the transferred assets. Held: National is not liable as a transferee for State's Federal income tax liabilities. Gene W. Reardon, First Nat'l Bank Bldg., Philadelphia, Pa., for the petitioner. Leo K. O'Brien, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent asserted liability against petitioner as transferee of The First State Bank of Walsenburg (hereinafter referred to as State) for the year ending December 31, 1955 and the taxable period from January 26 to November 30, 1958 of $3,985.70 and $1,710.90, respectively. The bases for these assertions were: (a) Allocation of a net operating loss of $16,087.21 incurred by State during the period January 1 to November 30, 1958 (which State had previously carried back to 1955) to two taxable periods, the first beginning January 1 and ending January 25, 1958 and the second beginning January 26 and ending November 30, 1958, so that only the portion of the loss attributable to the first period, namely, $8,422.42, was available as a carryback *46 to 1955, resulting in an increase in State's taxable income for 1955; (b) inclusion in State's income of amounts collected by a State stockholder; and (c) liability of petitioner for the deficiencies against State as a transferee of State. At the conclusion of the trial, respondent moved further to amend his answer in order to assert alternative liabilities for 1955 and for the period January 1 to November 30, 1958 of $8,365.35 and $18,951.46, respectively. The increased liabilities were asserted in the event that the Court sustained the petitioner's contention that the transactions involved constituted a sale of certain assets by State to National followed by a bona fide liquidation of State rather than a reorganization of State. In such event, respondent conceded that there would be a fusion of the previously fissioned 11-month period of 1958 and asserted that State would be required to restore to income for such period its reserve for bad debts. The threshold question presented for decision is whether National is a transferee within the meaning of section 6901. [2] In the event that this question is resolved against the petitioner, then the further issues presented are: (a) Whether *47 the transactions involved constituted a sale of certain assets by State to National and a bona fide liquidation of State, or a reorganization of State; (b) whether State should have included its reserve for bad debts in income for its taxable period ended November 30, 1958; and (c) whether collections by one of State's stockholders of rents and of principal and interest on certain notes previously written off as worthless by State were includable in State's income. Since our decision is confined to the threshold question, we confine our findings of fact to those necessary to that decision. Findings of Fact The stipulation of facts and exhibits thereto are incorporated herein by reference. State commenced business in Colorado under a charter from the State of Colorado in 1909, under the name of Guaranty State Bank. Its name was changed to The First State Bank of Walsenburg. At all times since its incorporation to and including January 25, 1958, it carried on its business as a state bank in Walsenburg, Colorado. State filed its returns for the taxable periods involved herein *48 with the district director of internal revenue, Denver, Colorado. In 1957 an application was filed to organize a national bank in Walsenburg with the Comptroller of the Currency. The application was approved in December 1957. The Comptroller stipulated that until the bank's capital structure reached $300,000 and its reserve for bad debts amounted to $25,000: (1) No dividends would be paid, (2) compensation to an officer-director principal stockholder would not exceed $1,200 per annum, and (3) State's banking premises and furniture and fixtures would not be acquired but would be leased free of charge to the national bank by State. On January 14, 1958, State's shareholders adopted a plan pursuant to which there would be transferred to National all of State's bonds, mortgages, loans, and discounts in consideration of National's assumption of certain of State's liabilities. From State's remaining assets its officers would retain sufficient cash to satisfy all claims and to reacquire any mortgage, loan, or discount transferred to National with respect to which, within six months of the date of transfer, there occurred a breach of warranty. The plan contemplated the liquidation of State *49 within one year. The building in which State conducted its banking business was to be distributed in liquidation to the shareholders subject to a lease to National which would conform to the condition established by the Comptroller of the Currency. On January 23, 1958, the Comptroller granted a charter to petitioner and thereby authorized it to begin operating as a national banking association. The transfers were consummated on January 25, 1958 in accordance with an agreement entered that day between National and State. Under the agreement, National acquired the following assets of State: Lease on bank building, vaults, safe-
deposit boxes, furniture, and fix-
tures
Rent free
Government bonds
$1,865,369.87
Other bonds
656,721.40
Loans, discounts, and mortgages
$ 838,392.26
Cash [1]
466,771.23
Total
$3,827,254.76
As consideration for the transfer of assets, National assumed an equivalent amount taken on face value of outstanding obligations *50 on deposits, cashier's checks, certified checks, treasurer's checks, expense checks, money orders, leases on safe-deposit boxes, and any commitment to make loans under any then-existing agreement or line of credit. Immediately after the transfer to National, State had net assets in excess of $400,000. During the period January 25 to November 30, 1958, distributions in liquidation were made and State was formally dissolved on January 5, 1959. Ostensibly in fulfillment of the condition contained in the letter to National from the Comptroller of the Currency dated December 20, 1957, National in due course established on its books of account a reserve for bad debts in the amount of $25,000. State filed a timely Federal income tax return for the period January 1 through November 30, 1958, and included in income its bad debt reserve of $53,281.78. Upon audit, respondent determined that such reserve carried over to National and that consequently State was not required to include such reserve in its income for that period. As a consequence, respondent determined that State had a net operating loss which entitled it to a refund for such period and to a further refund for 1955 as a result *51 of the carryback of such loss to that year. On September 19, 1961, two checks aggregating $25,727.38, representing such refunds, and interest thereon, were issued to State by the Treasurer of the United States. These checks were endorsed by State and transferred to National. Of the total amount refunded $3,464.31 represented interest which National reported as income in its Federal income tax return for 1961. At the time of the transfer of the refund checks to National, State had been liquidated and dissolved and was insolvent. Opinion Respondent asserts liability against petitioner herein solely in its capacity as transferee. Consequently, as we have already noted, the threshold question for decision is whether such liability on the part of petitioner exists under section 6901. At the outset, we hold that there is clearly no liability based upon a contractual obligation of National to pay State's taxes; section 2.02 of the agreement of transfer sets forth the specific liability which National assumed and taxes were not included. Both petitioner and respondent have concentrated their arguments as to transferee liability on the single issue as to whether the transfers from *52 State to National were with or without consideration. Respondent appears to concede on brief that the initial transfer on January 25, 1958 was for adequate consideration and we agree. By that transfer, National assumed certain liabilities of State and the record is devoid of any evidence that the amount of such liabilities was any less than the value of the assets received by National. Moreover, immediately after the transfer, State had net assets in excess of $400,000, even taking into account the liabilities asserted by respondent herein. Under these circumstances, we do not believe that any transferee liability can be asserted based on the January 25, 1958 transfer. (C.A. 8, 1938); ; ; ; . Nor does our decision in , militate against this conclusion; in that case the transfer appears to have involved *53 all the assets of the transferor in an amount in excess of the liabilities assumed for which excess stock was issued (see and, for aught that appears, a timely assessment was made against the petitioner therein as the successor in interest rather than the transferee of the transferor. Respondent asserts, however, that the transfer of the Federal income tax refund checks by State to National in September 1961 was without adequate consideration. At the time these refunds were turned over to National, State had been fully liquidated and dissolved and it was admittedly otherwise insolvent. Petitioner, on the other hand, claims that this amount represented a payment by State to National in accordance with the January 25, 1958 agreement to compensate the latter for having established a reserve for bad debts in the amount of $25,000 in accordance with the instructions of the Comptroller of the Currency. An examination of the letter from the Comptroller of the Currency reveals that the establishment of such a reserve was not mandatory, but was simply a prerequisite to certain actions by National, to wit, the payment of dividends, *54 the payment of salaries, fees, and bonuses in excess of $1,200 per annum to an officer-director principal stockholder, the purchase of or payment of rent for the banking premises and furniture and fixtures, and adjustment for accrued interest on loans acquired from State. The testimony of Murray, the president of National, was far from clear, but in the final analysis he did testify that the purpose of the transfer of the refund checks was to compensate National for the bad debt reserve. The fact that the refund checks totaled approximately $25,000 tends to support petitioner's position. (The aggregate amount of the two checks was $25,727.37 but included in this amount was some $3,464 of interest which National reported as income and on which it paid tax, with the result that the net benefit of the checks to National was somewhat less than $25,000.) It seems to us that the establishment of this reserve by National reflected a business judgment, buttressed by the conditional instruction of the Comptroller of the Currency, that the true value of the mortgages and loans and discounts taken over by National was less than the value put on them in the January 25, 1958 agreement. While *55 that agreement was obviously carefully drawn, it did not by its terms cover the situation where there was a subsequent downward valuation of the assets transferred. However, section 2.03 of the agreement did provide that if the liabilities assumed on January 25, 1958 turned out to be less than the agreed value of the assets, then the difference was to be made up by a cash payment on that date by National to State; contrariwise, if those liabilities turned out to be in excess of such agreed value, then on that date State was to make a cash payment of the difference to National. In fact, the latter was the case; hence the payment of approximately $466,000 to National at the closing. By section 7.01 of the agreement, State warranted that with respect to all mortgages and loans and discounts the amounts due and owing therein as shown on the books of State were correct, and by section 7.02 State obligated itself to repurchase any mortgage or loan and discount which was found within six months of the closing not to have been due and owing. It seems to us that the fair import of these provisions is that adjustment was to be made in the event that the value of assets turned out to be less *56 than the amounts set forth in the agreement. The transfer of the refund checks merely implemented this understanding and they were therefore delivered to National against full consideration in the form of an assumption of excess liabilities. If the burden of proof were on the taxpayer, we might well be willing to find that on the state of the record it had failed to sustain its position that the refund checks were transferred for adequate consideration. But where transferree liability is involved the burden of proof is on the respondent under section 6902(a) and we hold that he has not sustained the burden of showing that the refund checks were transferred for inadequate consideration. In view of our conclusion, we do not reach the question whether the transactions between State and National constituted a bona fide sale and liquidation, or a reorganization. See (C.A. 4, 1965), modifying ; , on appeal (C.A. 2, June 11, 1965); , on appeal (C.A. 9, Sept. 28, 1964); ; *57 . Nor need we reach any decision as to (a) whether State had a single taxable period covering the period January 1, 1958 to November 30, 1958 or two taxable periods (i.e., January 1, 1958 to January 25, 1958 and January 26, 1958 to November 30, 1958) or (b) the taxability to State of the bad debt recoveries and rent. With respect to respondent's motion further to amend his answer made at the conclusion of the trial, we note that the increased deficiencies proposed therein were asserted only in the eventuality that the Court accepted petitioner's view of the substantive nature of transactions between State and National in January 1958. The issues involved in the proposed amendment are inextricably entwined with the issues involved in the petition and original answer. Although we do not condone respondent's delay in making his motion until the conclusion of the trial, we do not see how petitioner can in any way be prejudiced by granting the motion and it is accordingly granted. We note that, in light of our decision on the transferee issue, respondent's assertion of increased deficiencies is meaningless. Decision will be entered *58 for the petitioner. Footnotes
1. This case was heard by Judge Morton P. Fisher and briefs were duly filed. Judge Fisher died on February 11, 1965. This case, not having been disposed of, was reassigned to Judge Theodore Tannenwald, Jr., on August 4, 1965, and notice was given to the parties that any request for rehearing or reargument might be presented to him within 30 days. No such request has been received.↩
2. All references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified.↩
1. Section 2.03 of the agreement specifically provided that if the value of the liabilities assumed exceeded the value of the assets transferred, State would pay National the difference in cash on January 25, 1958.↩